# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. CR416-147 |
| | ) | |
| COREY STAFFORD | ) | |

## REPORT AND RECOMMENDATION

Corey Stafford has been indicted for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Doc. 1 (indictment). He moves to suppress the evidence against him (docs. 24, 28), contending that (1) police violated his Fourth Amendment rights by detaining him without a "reasonable articulable suspicion that a crime was being or had been committed," and (2) his post-arrest statements came after "he had already invoked his constitutional right to counsel." Docs. 18 & 21.

## I. BACKGROUND[1]

On October 7, 2015, members of the Savannah-Chatham Metropolitan Police Department's Violent Crime Task Force (VCTF)[2] operated in the area immediately surrounding the Island Breeze nightclub on Montgomery Street in Savannah, Georgia. Doc. 30 at 11. Long a location infested with "[d]rug use, drug sales, weapons violations," and violent crime, the VCTF targeted the club at closing, when most problems occurred. *Id.* at 11. Around 2:00 a.m., VCTF detective Angel Gonzalez "drove down Montgomery Street and . . . began spotting, if you will, for things that [are] either . . . suspicious or violations of crime [sic]." *Id.* at 32. He noticed a Chrysler 300 that seemed to be "pausing, impeding the flow of traffic." *Id.* at 33. He "aired the [vehicle] information, at which point . . . [he] saw an individual walking up to the driver's side of the car," while it remained

---

[1] The following facts come from the evidentiary hearing held on the present motion. Doc. 30 (hearing transcript). The Court heard testimony from two witnesses, both local police officials. Stafford did not testify or offer any evidence at that hearing.

[2] The VCTF is a volunteer unit that works 3 to 5 nights a week in violent areas of Savannah. Doc. 30 at 8-9. The officers involved "observe illegal activities . . . [and] do on-view street-level police work." *Id.* at 9. The VCTF is a "proactive unit," that goes in and tries "to intercept, interdict illegal activities as [they're] occurring or before [they] occur[]." *Id.* at 10.

in Montgomery Street, "and then immediately just leaving it, which was indicative of, [he] believed, . . . a drug transaction."[3] *Id.* at 33-34. Gonzalez repositioned his unmarked car to better observe the Chrysler while "blending in with other vehicles." Doc. 30 at 34. By the time he parked, the suspect vehicle had itself backed into the lot of a car repair shop located across the street from the nightclub, a lot commonly used by club-goers for overflow parking. *Id.*

Lieutenant (now Captain) Ashley Brown, the VCTF's founder and leader, "was in the area as well" in a marked police vehicle. Doc. 30 at 11. While driving south down Montgomery, Brown noticed a vehicle a few car lengths ahead of him stopped in the road blocking traffic. Doc. 30 at 12-13. After ending a cell phone call, he realized that ongoing VCTF radio chatter included discussion of that same vehicle. *Id.* Once the subject vehicle backed into the parking lot, traffic cleared in front of

---

[3] In his report, Gonzalez wrote that he "observed individual*s* walking up to the driver's side of the vehicle." Doc. 24 at 5 (emphasis added). At the hearing, however, he testified that he saw only one person approach the driver and engage in a suspected drug transaction. Doc. 30 at 33. That apparent discrepancy exists for no other reason than Gonzalez's report attempted to describe the volume of foot traffic in the repair shop parking lot, while his hearing testimony "reference[d] . . . what [he] believed to be the hand-to-hand transaction." *Id.* at 44. The Court finds that explanation credible (as it does Gonzalez more generally).

3

his car and Lt. Brown "made [his] way up there . . . [,] activated [his] blue lights," and "exited [his] vehicle." *Id.* at 13-14, 19.

At that point he noticed two cars parked next to each other in the repair shop lot. "One was a Chrysler 300. The other one [Brown thought] was a Dodge." *Id.* at 14. "They looked similar. So when [he] walked up, [he] wasn't quite sure which one had [just] backed in." *Id.* As he approached the cars, he saw three people in the Chrysler, "two in the front seat and one in the back seat behind the driver." *Id.* The two people in the front got out and began talking to Brown. *Id.* As that conversation occurred, the person in the back seat (Stafford) leaned "way over toward the passenger's seat" and appeared to place something on the floorboard. *Id.*

Having done street level police work "for 22 years, [Lt. Brown] found that to be a bit suspicious."[4] Doc. 30 at 14. Stafford "then exited the vehicle" and walked away from Brown "south through the [garage's] parking lot." *Id.* at 15. Brown "called him back," *id.*, by using his hand

---

[4] Brown testified that he "wondered what [Stafford] was, number one, trying to get away from him, and number two, why he was leaning way over to hide something." Doc. 30 at 15.

4

to motion Stafford to return to the area in front of the Chrysler and Brown's marked car. *Id.* at 36. Stafford complied. *Id.* at 16.

Other VCTF officers began obtaining information about the front seat men and Stafford. Doc. 30 at 16-17. As that process unfolded, Lt. Brown began to "walk around the car." *Id.* at 17. He saw an open container of beer in the front seat, and a handgun "pushed partially up underneath the seat" in the area where Stafford appeared to reach a moment earlier. *Id.*

Brown advised his officers to "secure the three gentlemen that were in the car[,] . . . separate them[,] and . . . continue th[e] investigation." Doc. 30 at 18. Other officers seized the gun, and Stafford was then transported to the local police precinct where Det. Gonzalez hoped to interrogate him further. *Id.* After interviewing the men from the front seat, Gonzalez "approached Mr. Stafford, and . . . advised him that he was going to be brought into the room, that [Gonzalez would] advise him of his constitutional rights and we were going to hear his side of the story." *Id.* at 38.

Immediately thereafter, and before entering the interview room, Stafford "said, hey, look, you guys got me with a gun, just charge me and

take me to jail." Doc. 30 at 38; doc. 24 at 6. Gonzalez reiterated that he wanted to hear Stafford's side of the story, and read him his rights, to which Stafford responded: "I want to speak to my lawyer." *Id.* at 39. Gonzalez ceased communicating with him at that point, placed him under arrest, and explained the charges he faced. *Id.*

## II. ANALYSIS

### A. The Initial Encounter

Stafford first contends that his "initial detention was without probable cause, [and] that the officers' approach to the vehicle was made without reasonable articulable suspicion that a crime was being or had been committed," and thus constituted an unconstitutional seizure. Doc. 28 at 2. "The touchstone of [an] analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968). Simple consensual encounters, where an officer "approaches an individual and asks a few questions," are always reasonable (*i.e.*, they involve no seizure). *Florida v. Bostick*, 501 U.S. 429, 434; *see also Utah v. Strieff*, \_\_U.S.\_\_, 2016 WL 3369419 at \* 7 (2016) ("Nothing

6

prevent[s a police officer] from approaching [a defendant] to simply . . . ask" him questions; a person may leave such an encounter at any time).

By contrast, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' . . . [and] is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). The existence of probable cause depends purely on the objective facts available to the officer. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813.

Consequently, the Supreme Court has rejected the notion that a traffic stop based on probable cause is constitutionally permissible only if a reasonable officer would have made the stop solely for the purpose of enforcing the traffic laws. *Whren*, 517 U.S. at 813-15; *see Riley v. City of Montgomery*, 104 F.3d 1247, 1252 (11th Cir. 1997) (the constitutional reasonableness of a traffic stop is determined irrespective of the intent of the individual officer or a theoretical "reasonable officer"). "[A] police

officer [thus] may stop a vehicle '[w]hen there is . . . probable cause to believe the driver is violating any one of a multitude of applicable traffic and equipment regulations' relating to the operation of motor vehicles" regardless of whether any other detention motivations exist. *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990) (quoting *Delaware v. Prouse*, 440 U.S. 668 (1979)).

Here, both Gonzalez and Brown witnessed a Chrysler 300 impede the flow of traffic by coming to a stop in a lane of moving cars on a busy road. *See* doc. 30 at 33 (the Chrysler "stopped right before the club . . . and . . . vehicles were having to pass it"); *id.* at 12 ("[T]here was a car that had blocked traffic and had -- was backing into a parking place at the garage."). That traffic violation[5] alone -- to say nothing of the loitering around the vehicle and previous "violent activity that has resulted from individuals loitering in [that] area" (doc. 24 at 5) -- provided probable cause for Brown's "blue lighting" the Chrysler.[6] *See*

---

[5] *See* O.C.G.A. 40-6-184 ("No person shall drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic. . . .").

[6] Although Brown was not certain that it was the Chrysler, rather than the adjacently-parked Dodge, that had blocked traffic, he had a right to approach either vehicle to investigate his suspicions.

8

*Mimms*, 434 U.S. at 109 ("[T]here is no question about the propriety of the initial" stop where defendant violated Pennsylvania traffic law by "driving an automobile with expired license tags"); *see also Shell v. State*, 315 Ga. App. 628, 630 (2012) ("It is axiomatic that a police officer who observes" "the traffic violation of impeding the flow of traffic . . . is authorized to conduct a traffic stop of the vehicle in question.").[7]

Once Brown initiated a lawful traffic stop,[8] he had every right to "exercise unquestioned command of the situation" because of the great

---

[7] Reasonable suspicion -- to approach the Chrysler and investigate -- also grew out of Gonzalez's witnessing what his experience showed to be a possible drug transaction (a person walking up to the driver's door and then quickly walking away), in the parking lot of a closed business, outside a particularly violent nightclub in a particularly violent and drug-infested part of the city. *See, e.g., United States v. Packer*, 375 F. App'x 976, 980 (11th Cir. 2010) (officer had reasonable suspicion to search defendant after traffic stop made "in a neighborhood known for high drug trafficking," and after observing defendant's car "engaged in what appeared, in his experience, to be a drug transaction").

But Brown first approached the vehicle, not Gonzalez, and it's unclear whether Brown knew of Gonzalez's drug transaction observation at the time he blue lighted the Chrysler. *See* doc. 30 at 11-12 ("I was in traffic. I was actually distracted. I think I was on the telephone, and I heard some chatter on the radio. By the time I hung up the phone and started listening, I realized what they were talking about was directly in front of me, just a few cars away."). Because of that ambiguity, and because Brown quite unambiguously had good reason to conduct a traffic stop, the Court need not rely on Gonzalez's drug deal observation to justify Brown's investigation of the Chrysler.

[8] At the evidentiary hearing, defense counsel attempted to distinguish between a situation where an officer stops a car for a traffic violation versus that where an officer approaches a car that's already stopped to investigate an earlier committed

9

potential for danger associated with *any* traffic stop, *Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (quoting *Michigan v. Summers*, 452 U.S. 692, 703 (1981)); *Mimms*, 434 U.S. at 110 (an "inordinate risk" confronts every officer investigating a routine traffic violation), much less one conducted in an area where shootings and violence are commonplace. That right included constitutional authorization to order both the driver and any passengers to exit the vehicle,[9] remain in the vehicle,[10] or take other reasonable action depending upon the exigencies of the particular circumstances.

*Clark* provides a good illustration of that authority. There, a police officer, patrolling alone in a high crime area much like Lt. Brown, witnessed two men fighting in the street and a third person watching from the sidewalk. 337 F.3d 1282, 1283 (11th Cir. 2003). The officer

---

violation. *See* doc. 30 at 19. That's an illusory distinction with no bearing on the constitutionality of Brown's actions. *See United States v. Clark*, 337 F.3d 1282, 1286-87 (11th Cir. 2003).

[9] *Mimms*, 434 U.S. at 111 n. 6 ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."); *Wilson*, 519 U.S. at 410 (*Mimms* applies to passengers).

[10] *See Clark*, 337 F.3d at 1288 (officer did not violate bystander's Fourth Amendment rights when he ordered him to reenter vehicle and keep his hands visible after officer encountered the bystander's companions fighting in the street).

ordered all three people, including the non-combatant, into their nearby parked car. *Id.* "[E]ven absent any individualized suspicion" of the third person, the officer could lawfully detain him "by ordering him into the vehicle in order to control the situation . . . for the same reasons that the officer in *Wilson* could order the defendant passenger out of the vehicle." *Clark*, 337 F.3d at 1285.

Those same justifications provide constitutional cover for Lt. Brown calling Stafford back to the Chrysler after he began to walk away in the middle of Brown's investigation. Brown witnessed Stafford, while alone inside the Chrysler, furtively reach under the passenger seat. Already alone in a crime-ridden area talking with possible suspects, it was reasonable for Brown to control the situation by ordering Stafford to return to the scene. *See Clark*, 337 F.3d at 1285. For all Brown knew (though his subjective intentions are irrelevant), Stafford had a weapon and planned to turn around and shoot from a safe distance. Stafford's unannounced departure and the distraction it created may also have given the other two men, or any of the other many club patrons in the area, the opportunity to harm Brown.

By contrast, Stafford's freedom of movement was "already stopped" because of the lawful traffic investigation and a further limitation -- not being able to leave the scene -- imposed a *"de minimis"* intrusion on his personal liberty. *United States v. Lewis*, 674 F.3d 1298, 1312 (11th Cir. 2012). "Once [Brown] had . . . reasonable suspicion of criminal activity [a traffic violation], [he was] not obliged to let . . . the associated individuals walk about freely while [he] investigated . . . in light of [his] powerful concern for [his] own safety." *Id.* at 1309.

Because the traffic stop and Stafford's ensuing detention after he attempted to leave the scene comported with the Fourth Amendment, the subsequent seizure of a handgun from the Chrysler did, too. Brown had every right to conduct a protective search of the vehicle,[11] but here he didn't even need to do that. The gun sat in plain view on the floorboard of the Chrysler. Doc. 30 at 17. Brown saw it without ever entering the vehicle. *Id.* Once he lawfully seized Stafford, his companions, and the car, no constitutional impediment stood in the way

---

[11] *Michigan v. Long,* 463 U.S. 1032 (1983) (police may conduct a *"Terry*-type search of the passenger compartment of a motor vehicle during the lawful investigatory stop of the occupant of the vehicle"); *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) ("[O]fficers conducting a traffic stop may 'take such steps as [are] reasonably necessary to protect their personal safety,' . . . including conducting a protective search of the . . . vehicle.") (citations omitted).

of then seizing a weapon in plain view. *See Whren*, 517 U.S. at 809-10 (officers "patrolling a 'high drug area' of [a] city" had reasonable suspicion to stop "a dark Pathfinder truck with temporary license plates and youthful occupants waiting at a stop sign, [with] the driver looking down into the lap of the passenger at his right;" hence, "two large plastic bags of what appeared to be crack cocaine" visible in a passenger's hands through the truck's windows could thereafter be seized).

B. **Stafford's "You Got Me" Statement to Police**

Defendant also contends that his incriminating statement to Det. Gonzalez -- "you guys got me with a gun, just charge me and take me to jail" (doc. 24 at 6) -- came *after* he invoked his constitutional right to counsel. Doc. 28 at 2. Gonzalez's testimony at the hearing, and his police report, indicate the opposite -- that Stafford made his incriminating statement and *then* asked for a lawyer after Gonzalez pressed once more for an interview. *See* doc. 24 at 6; doc. 30 at 38-39.

Stafford presents no evidence -- not even a valid affidavit[12] -- to support his claim. Gonzalez, on the other hand, gave a clear and

---

[12] Local Rule 12.1 requires an affidavit, or other evidence of record, to support the factual assertions made in a defendant's motion to suppress. Otherwise, the Court is

13

believable account of the events at the hearing. The Court accordingly credits his testimony, which in this case is dispositive.

"It is of course well settled that law enforcement officials may not conduct a custodial interrogation of a suspect without first advising him of the rights guaranteed by the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 471 (1966)." *United States v. Pulido-Tejedo*, 2007 WL 1812654 at * 3 (S.D. Ga. June 18, 2007), *adopted*, 2007 WL 2226057 (S.D. Ga. July 30, 2007).

> *Miranda*, however, was never meant to apply to all statements taken by the police after a person has been taken into custody, but only to those statements that result from "express questioning or its functional equivalent." *Id.* at 300-301. The protections of *Miranda*, therefore, do not extend to spontaneous, unprompted statements made to law enforcement officers after a suspect has been taken into custody. *Miranda*, 384 U.S. at 478; *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir.1991) ("Voluntary and spontaneous comments by an accused, even after *Miranda* rights are asserted, are admissible evidence if the comments were not made in response to government questioning.").

*Id.*

---

not required to conduct an evidentiary hearing. Here, defense counsel furnished his own "affidavit" (doc. 28 at 5), but as the Court pointed out at hearing, it was not an affidavit at all—it was unsworn and was entirely hearsay, as counsel was not an observer of the events he described.

When Stafford incriminated himself, he was at the local precinct for questioning after being detained, and thus he was in custody. His statement came before Gonzalez brought him into the interview room for what unquestionably would have been an interrogation, and before any *Miranda* warnings were given. Stafford spoke without Gonzalez questioning him and thus *Miranda* provides no protection. *Pulido-Tejedo*, 2007 WL 1812654 at * 4. Hence, his spontaneous, unprompted statement is admissible.

## III. CONCLUSION

Accordingly, Corey Stafford's motions to suppress (docs. 18 & 28) should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this  7th  day of July, 2016.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA